1   RONALD K. ALBERTS (SBN 100017)
    TAD A. DEVLIN (SBN 190355)
2   GORDON & REES LLP
    275 Battery Street, Suite 2000
3   San Francisco, CA 94111
    Telephone: (415) 986-5900
4   Facsimile: (415) 986-8054

5   Attorneys for Defendants
    THE PRUDENTIAL INSURANCE
6   COMPANY OF AMERICA, REAL PARTY IN
    INTEREST, AND THE H.F. AHMANSON &
7   COMPANY LONG TERM DISABILITY PLAN

8                UNITED STATES DISTRICT COURT

9             FOR THE NORTHERN DISTRICT OF CALIFORNIA

10

11   ELIZABETH E. EDWARDS,            CASE NO. 3:07-cv-5807 (VRW)

12                Plaintiff,     **DEFENDANTS' OPENING TRIAL**
                                  **BRIEF**
13      v.

14   THE PRUDENTIAL INSURANCE
    COMPANY OF AMERICA; THE H.F.
    AHMANSON & COMPANY LONG TERM
15   DISABILITY PLAN; and DOES 1 through 20,
    INCLUSIVE,
16
               Defendants.
17

18

19

20

21

22

23

24

25

26

27

28

# TABLE OF CONTENTS

**Page No.**

I.  INTRODUCTION ..................................................................................................1

II. STATEMENT OF FACTS .....................................................................................2

    A.    Prudential Determines Edwards Meets the Definition of "Totally Disabled" ........2

    B.    Prudential Extends LTD Benefits In Light of Edwards' Salvage Fusion Surgery ..3

    C.    Edwards Submits a Claim for Permanent Partial Disability to Take Effect Upon Termination of Her LTD Benefits ..................................................................3

    D.    Prudential Requests a Peer Review from Dr. George Becker ................................3

    E.    Prudential Investigates the "Benefit Limitation" on Edwards' Policy and the Severity of Her Psychiatric Condition ....................................................................4

    F.    Prudential Requests Edwards Complete a Daily Activity Questionnaire to Further Evaluate the Disabling Nature of Her Condition .........................................5

    G.    Prudential Requests Initial Video Surveillance of Edwards' Functionality ...........5

    H.    Prudential Requests Supplemental Medical Reports ...............................................6

    I.    Prudential Requests Second Video Surveillance of Edwards' Functionality ..........6

    J.    Edwards' December 2005 Activities of Daily Living Questionnaire .....................7

    K.    Prudential Arranges for a Sedentary Level Functional Capacity Evaluation (FCE) of Edwards ...................................................................................................7

    L.    Kolman Reviews Surveillance of Edwards and Concludes Edwards Does Not Exhibit the Guarding or Pain She Presents in FCE....................................................8

    M.    Prudential Requests A Peer Review Report........................................................9

    N.    Prudential Denies Long Term Disability Benefits................................................10

    O.    Prudential Clarifies the Termination of Benefits and Provides Edwards with Copy of the Claims File and Related Documents.............................................11

    P.    Edwards Appeals Prudential's Decision to Deny Further Benefits......................12

    Q.    Prudential Arranges for a Second Peer Review.....................................................12

    R.    Dr. Denver Watches the Video Surveillance and Finds Edwards is Much More Functional than She Claims and Can Engage in a More Active Lifestyle, Including Full Time Work Activities Within Her Restrictions .............................13

        1.    Dr. Denver Found the FCE Showed An Overall Level of Work Consistent with the Sedentary Range .........................................................................13

i

1                    2.    Dr. Denver Communicated with Drs. Light & Wolfe .............................14

2          S.    Prudential Upholds Termination of Benefits – September 6, 2007 .....................14

3    III.    THE LEGAL STANDARD OF REVIEW ......................................................14

4          A.    The Standard of Review.......................................................................14

5          B.    The Governing Plan Language Pertinent to This Claim .........................................15

6    IV.    PRUDENTIAL'S DECISION DENYING LTD BENEFITS WAS CORRECT
         AND SUPPORTED BY THE ADMINISTRATIVE RECORD .......................................16

7          A.    The Video Surveillance Contradicts Edwards' Claims ........................................16

8          B.    Edwards' Credibility Is Undermined By The Discrepancies Between Her
9               Behavior During the FCE And On Video................................................................18

10         C.    The Video Surveillance Contradicts Edwards' Stated Limitations in Her
              Activities of Daily Living Questionnaire...............................................................19

11         D.    Prudential's Decision is Supported by the Opinions of Two Board Certified
12              External Reviewing Physicians...........................................................................20

13         E.    Edwards' Physicians Document Improvement in Her Condition.........................21

14   V.    EDWARDS' CLAIM FOR EQUITABLE RELIEF IS IMPROPER AND MUST
         BE DENIED........................................................................................................21

15   VI.    CONCLUSION.................................................................................................22

16

17

18

19

20

21

22

23

24

25

26

27

28

1

## TABLE OF AUTHORITIES

2

**Page No.**

3  **Cases**

4  *Abatie v. Alta Health & Life Ins. Co.*
        458 F.3d 955 (9th Cir. 2006) ............................................................................... 15

5

6  *Eppler v. Hartford Life and Acc. Ins. Co.*
        2008 WL 3266469 (N.D. Cal. Aug. 7, 2008) .................................................... 16, 21

7  *Ford v. MCI Comm. Corp. Health & Welfare Plan*
        399 F.3d 1076 (9th Cir. 2005) ............................................................................ 22

8

9  *Forsyth v. Humana, Inc.*
        114 F.3d 1467 (9th Cir. 1997) ............................................................................ 22

10  *Hornback v. New York Times Co. Long Term Disability Plan*
        2006 WL 496050 (N.D. Cal. March 1, 2006) ...................................................... 16

11

12  *Hoskins v. Bayer Corp. and Business Services Long Term Disability Plan*
        2008 WL 2561959, *1 (N.D. Cal. June 25, 2008) .............................................. 18

13  *Korotynska v. Metropolitan Life Ins. Co.*
        474 F.3d 101 (4th Cir. 2006) .............................................................................. 22

14

15  *Litt v. Paul Revere Life. Ins. Co.*
        2006 WL 1095847 (N.D. Cal. April 25, 2006) ............................................. 16, 17, 18

16  *Pollard v. Liberty Life Assur. Co.*
        2006 WL 1867726 (N.D. Cal. July 6, 2006) ........................................................ 16

17

18  *Sabatino v. Liberty Life Assurance Co. of Boston*
        286 F.Supp.2d 1222 (N.D. Cal. 2003) ................................................................ 15

19  *Varity Corp. v. Howe*
        516 U.S. 489 (1996) ........................................................................................... 21

20

21

22

23

24

25

26

27

28

## I.    **INTRODUCTION**

Plaintiff Elizabeth Edwards ("Edwards") sued Defendants, THE PRUDENTIAL INSURANCE COMPANY OF AMERICA ("Prudential") and THE H.F. AHMANSON & COMPANY LONG TERM DISABILITY PLAN (the "Plan" or "LTD Plan") (collectively "Defendants"), for long term disability ("LTD") benefits.  Prudential is the underwriter of the LTD Plan.

Edwards alleged causes of action against Defendants for recovery of employee benefits, breach of fiduciary duty, equitable relief, and failure to produce documents.  Defendants filed a Motion to Dismiss Edwards' claim for breach of fiduciary duty, equitable relief, and failure to produce documents.  On January 7, 2008, this Court granted Defendants' Motion to Dismiss Edwards' claims for breach of fiduciary duty and failure to produce documents without prejudice and denied Defendants' motion to dismiss Edwards' claim for equitable relief, however, casting doubt on the validity of such claim stating: "Defendants may ultimately be correct that Edwards' § 1132(a)(3) claims are merely 'attempts to artfully plead around the fact that she solely seeks recovery of her disability benefits."  (Order at 11:25-28; Docket 34)  Edwards abandoned her claims for breach of fiduciary duty and failure to provide documents.  The scope of Defendants' Opening Trial Brief is limited to Edwards' claims for recovery of employee benefits and equitable relief.

Edwards was a mortgage lender at Washington Mutual Bank/Home Savings ("WAMU") for three years when she stopped working on December 29, 1998 due to a central disc herniation.  Edwards underwent lumbar spine surgery in January 1999 and received disability benefits for approximately eight years.  On July 25, 2006, Edwards' LTD benefits were properly terminated because she no longer met the definition of disability under the terms of the LTD Plan.

Edwards appealed on March 5, 2007 and Prudential denied Edwards' appeal on September 6, 2007, finding she was not disabled from performing the material and substantial duties of any gainful occupation for which she may reasonably be fitted as required by the Plan.

Prudential's decision to terminate disability benefits was correct based on the evidence in the administrative record.  Edwards contends she is disabled from performing sedentary work,

1

1    claiming, among other things, she is unable to sit for more than a few minutes and unable to

2    stand or walk for more than 10 to 15 minutes.  However, the evidence in the record, including a

3    Functional Capacity Evaluation ("FCE"), the reviews of two external Board Certified physicians,

4    and the videotaped surveillance of Edwards' activities on multiple dates, shows otherwise.

5    Prudential's decision to terminate Edwards' LTD benefits was correct and should be affirmed by

6    this Court.

7    II.    **STATEMENT OF FACTS**

8         Edwards stopped working on December 29, 1998, due to a central disc herniation.  She

9    underwent lumbar spine surgery in January 1999 at L4-5, L5-S1 vertebrae.  (E01103, E01432)

10   Postoperatively she did well but noted back pain radiating to her thighs.  Prudential approved

11   LTD benefits effective June 27, 1999.  (E01431)  On November 22, 1999, Prudential advised

12   Edwards her treating physician indicated healing of the spine was expected one year after

13   surgery.  (E01432)  Since Edwards' surgery occurred on January 12, 1999, benefits would be

14   paid through January 12, 2000 and terminate effective January 13, 2000.  (E01432)  Edwards

15   appealed Prudential's decision to terminate benefits on May 2, 2000, asserting she was not fully

16   healed from surgery.  (E01385-01386)  On August 2, 1999, Prudential requested a copy of

17   Edwards' job description at WAMU.  (E00317-00318; E01474-01476)

18        A.    **Prudential Determines Edwards Meets the Definition of "Totally Disabled"**

19        On June 26, 2000, Prudential determined Edwards met the definition of Total Disability"

20   as set forth under Washington Mutual Group Policy # 99361 and reinstated payment of disability

21   benefits.  Prudential explained "'Total Disability' exists when Prudential determines all of the

22   following conditions are met:

23        1.    Due to sickness or accidental injury, both of these are true:

24             (a)    You are not able to perform, for wage or profit, the material and
                    substantial duties of your own occupation.

25
             (b)    After the Initial Duration of a period of Total Disability, you are not able
26                  to perform, for wage or profit, the material and substantial duties of any
                    job for which you are reasonably fitted by your education, training or
27                  experience.  The Initial Duration is shown in the Schedule of Benefits.

28

1      2.      You are not working at any job for wage or profit.

2      3.      You are under the regular care of a Doctor."

3      (E01234)

### B.  Prudential Extends LTD Benefits In Light of Edwards' Salvage Fusion Surgery

Edwards' initial spine fusion had improper healing at the L5-S1 level, which resulted in mechanical back pain.  On February 5, 2002, Edwards underwent post lateral salvage fusion surgery at L4-S1 and L5-S1.  The surgery was conducted by Kenneth Light, M.D., and he indicated Edwards emerged from the surgery in satisfactory condition.  (E01286-01287)

On May 22, 2002, Edwards submitted a Claimants' Statement and indicated that since she stopped working, she noticed stabilization of her lower back.  She noted the following symptoms interfered with her performing work:  back pain – healing from surgery, sitting, standing, lifting, and driving limitations.  She noted her expected return to work date as "by the fall."  (E01288)  In an accompanying Attending Physician's Statement, Dr. Light noted Edwards' symptoms as 'healing pain.'  Dr. Light's expected duration for this diagnosis was six to twelve months.  X-rays revealed early healing stages of lumbar spine fusion.  (E01288-01289)

### C.  Edwards Submits a Claim for Permanent Partial Disability to Take Effect Upon Termination of Her LTD Benefits

On or about March 17, 2003, Edwards submitted a claim for permanent partial disability. Edwards indicated she included doctors' reports with the claim, which showed that she continued to suffer from a disabling medical condition in her low back.  Edwards requested partial disability coverage once her total disability coverage expired on April 1, 2003.  (E00806-00807)

### D.  Prudential Requests a Peer Review from Dr. George Becker

On May 8, 2003, Prudential wrote to George Becker, M.D., and requested a comprehensive physical examination, review of the medical documentation and comment on any impairment significantly restricting Edwards from performing a sedentary occupation. Prudential provided Dr. Becker with the medical documentation contained in Edwards' file.

On May 22, 2003, Dr. Becker conducted a three-hour peer review.  He concluded

3

1  Edwards' current symptoms included constant low back pain and thigh and knee pain, which

2  caused her to curtail a number of activities.  Dr. Becker ultimately determined Edwards had pain

3  disorder with psychological factors and a physical condition.  He opined there was no reason

4  why Edwards could not regain optimal musculoskeletal function, if motivated.  Dr. Becker noted

5  he would certainly not give up on Edwards' surgery as a failure at this time, and Edwards may

6  have to experience some pain in order to benefit optimally from her surgery.  Dr. Becker opined

7  that with the appropriate psychotherapy support in conjunction with a functional restoration

8  program, Edwards should not give up as a life-long invalid.  (E00789-00794)

9  **E.    Prudential Investigates the "Benefit Limitation" on Edwards' Policy and the Severity of Her Psychiatric Condition**

10

11  On July 8, 2003, Prudential wrote to Edwards and explained the Benefit Limitation

12  applicable to Edwards under the Group Policy:

13  BENEFIT LIMITATION

14  "This Section applies if your Disability, as determined by Prudential, is caused at least in part by a mental, psychoneurotic, or personality disorder.  In that case,

15  benefits are not payable for your total disability for more than 12 months."

16  Prudential noted that the Benefit Limitation expired on June 27, 2001.  Prudential

17  enclosed a copy of Dr. Becker's Peer Review summary, which diagnosed Edwards with pain

18  disorder with psychological factors and physical conditions.  Prudential requested copies of all

19  medical records from Judith Levinson, PhD., to evaluate the severity of Edwards' psychiatric

20  condition. (E01195-01196)  On October 31, 2003, Dr. Levinson responded to Prudential and

21  indicated Edwards was treated with the general goal of improving her ability to manage her life

22  with chronic pain and physical disability.  Dr. Levinson concluded Edwards was not disabled on

23  a psychiatric basis and Edwards' treatment was for management of pain and disability from her

24  physical injuries.  (E01248)  Reports by Dr. Light on July 7, 2004 and October 6, 2004, indicated

25  Edwards had ongoing back pain and numbness in her legs and she would need ongoing pain

26  management.  (E00593)

27

28

1

**F.    Prudential Requests Edwards Complete a Daily Activity Questionnaire to Further Evaluate the Disabling Nature of Her Condition**

2

3    In November 2004, Prudential requested Edwards fill out a Daily Activity Questionnaire.

4    With regard to medical care, Edwards described her current medical condition as chronic lower

5    back pain, numbness in both legs, inflammation and neuropathy.  She indicated her limitations

6    included sitting, standing, walking, and lifting in excess of four pounds.  (E00639-00640)  With

7    regard to personal care, Edwards explained she needed some assistance with washing her hair at

8    home.  She noted trouble cutting her toenails due to neuropathy.  Edwards' friend Abigail

9    assisted Edwards with driving.  Edwards reportedly performed limited driving, mostly to

10   appointments, the gift shop, and the grocery store.  (E00640-00641)

11   With regard to daily activities, Edwards indicated she spent approximately 5-15 minutes

12   daily and 15-30 minutes weekly, on dusting, light gardening and washing dishes.  (E00642)  As

13   for interests and hobbies, Edwards noted she shopped for food and clothes weekly, for about 10-

14   25 minutes.  When she shopped, she required assistance lifting food items over four pounds,

15   pushing the cart, loading and unloading the car, and putting groceries away.  Edwards indicated

16   she volunteered on Sundays from 1 p.m. to 3 p.m. at Marin General Hospital.  (E00643)

17   **G.    Prudential Requests Initial Video Surveillance of Edwards' Functionality**

18   Prudential requested video surveillance of Edwards' functionality by International Claims

19   Specialists.  Surveillance was conducted for three days on December 19, 20 and 21, 2004.  On

20   Sunday, December 19, 2004, Edwards was observed driving herself and another woman to the

21   Marin General Hospital gift shop.  Edwards was observed working in the gift shop for

22   approximately four hours, where she stood for extended periods.  She was later driven to the

23   grocery store and did some light shopping.

24   On Monday, December 20, 2004, Edwards was observed driving herself to a medical

25   appointment where she sat in the car for approximately twenty minutes talking on her cellular

26   phone.  She then drove to an apartment complex where she walked a small dog.  Edwards then

27   went to a garden center, where she bought a few indoor plants, including two Poinsettia plants.

28   She walked to her car holding the two Poinsettia plants and a brown bag, which she placed in the

1    trunk.  Edwards then did some shopping at a small shopping center near her residence.  When

2    Edwards returned home she was seen leaning forward, reaching down towards a dog.  She then

3    walked the dog down her driveway and along the sidewalk.  Edwards' activities included

4    walking, driving, standing, leaning, bending, carrying and sitting.  On Tuesday, December 21,

5    2004, Edwards was not observed.  (E00614)

6         **H.**    **Prudential Requests Supplemental Medical Reports**

7         On January 7, 2005, Prudential wrote to Edwards' medical providers, as listed in her

8    Daily Activity Questionnaire, requesting current information regarding Edwards' status.

9         Dr. Cohen responded that he had not seen Edwards since December 2003.  (E00610)

10   Dr. Levinson responded and provided handwritten notes from April 2004 through January 2005.

11   Dr. Levinson's latest note of January 18, 2005, indicated Edwards was continuing with stretching

12   and isometrics, with some activity each day, and had a reinforcement schedule to keep it up.

13   (E00607)  Dr. Light wrote to Prudential on January 25, 2005 and indicated Edwards had good

14   sensation, reflexes, and strength in her legs.  He concluded Edwards' conditions appeared stable.

15   (E00591)  Dr. Wolfe indicated in his April 2, 2005 report that Edwards had developed chronic

16   pain.  (E00455-00456)

17        **I.**    **Prudential Requests Second Video Surveillance of Edwards' Functionality**

18        Prudential requested an investigator conduct three additional days of video surveillance

19   of Edwards.  Surveillance was conducted on August 17, 18 and 21, 2005.  No activity was

20   observed on August 17 or 18, 2005.  On August 21, 2005, Edwards was observed being driven to

21   the Marin General Hospital where she worked as a volunteer at the gift shop for approximately

22   four hours.  Edwards was videotaped inside the shop standing at the cash register.  She was later

23   observed kneeling to assist a customer with CDs.  She was observed bending and twisting while

24   on the ground looking for CDs.  The investigator noted Edwards displayed no signs of

25   discomfort while working around the store.  When Edwards exited the hospital she appeared to

26   be limping slightly.  She then entered the passenger side of a car and was observed being driven

27   to the grocery store.  The driver of the vehicle pushed the shopping cart upon exit from the store.

28   Edwards did not help load the groceries into the car.  Upon arriving at home, Edwards was

1  observed leaning into the rear passenger seat of the vehicle. The other female then handed her

2  some clothes on hangers from the trunk and Edwards walked into her residence and out of view.

3  The other female carried the groceries. (E00579-00586)

4      **J.**    **Edwards' December 2005 Activities of Daily Living Questionnaire**

5          Pursuant to Prudential's request, Edwards filled out the Activities of Daily Living

6  Questionnaire on December 15, 2005, and described her current medical condition as chronic

7  lower back pain, neuropathy, inflammation at times, and numbness in both legs and her middle

8  toe on both feet. She listed her limitations as sitting, standing, walking (10-15 minutes) and

9  lifting in excess of four pounds. Edwards noted that her condition remained the same since she

10  last filled out the Activities of Daily Living Questionnaire, in November of 2004. (E00559-

11  00560)

12      **K.**    **Prudential Arranges for a Sedentary Level Functional Capacity Evaluation (FCE) of Edwards**

13

14          On January 24, 2006, Dr. Wolfe noted Edwards' nerve pain had decreased and there was

15  less overall pain. He noted that radiating pain with the feeling of weakness was gone and

16  Edwards only had intermittent soreness. He further noted Edwards' back pain had improved and

17  she had a better activity tolerance. (E00413-00415).

18          On March 26, 2006, Prudential requested ErgoScience, Inc., ("Ergo") arrange for a FCE

19  of Edwards. The purpose of the evaluation was to determine Edwards' current level of

20  functionality at the sedentary work level.

21          On April 13, 2006, Bruce Kolman of Ergo conducted the FCE. The examination was

22  restricted to lifting no more than four pounds based on Dr. Light's medical advice. (E00107)

23  Kolman noted that due to Edwards' limited tolerance for sitting, she would need to alternate

24  between sitting, standing and walking to tolerate the sedentary level of work for the 8-hour day

25  and 40-hour workweek. He found Edwards was self-limited on 13% of the eight tasks, which

26  meant she stopped the task before a maximum effort was reached. Edwards reported her reasons

27  for self-limited behavior were because of increased pain and fear of re-injury. Kolman noted

28  Edwards' sitting posture exhibited hip and knee flexation. He stated Edwards' standing posture

1   exhibited increased hip, knee and ankle dorsiflexation.  He noted Edwards frequently moved
2   when standing.

3       Kolman concluded that based on Edwards' tolerance for sitting (occasionally), standing
4   (occasionally) and walking (frequently), Edwards was able to tolerate the sedentary range of
5   work for an 8 hour day/40 hour work week.  However, due to Edwards' limited tolerance for
6   sitting, she would have to alternate between sitting, standing and walking to tolerate the
7   sedentary level of work for the 8 hour day/40 hour week.  Kolman also concluded Edwards
8   should be capable of sustaining keyboarding activities on an occasional basis.  (E00344-00367)

9       **L.    Kolman Reviews Surveillance of Edwards and Concludes Edwards Does Not
          Exhibit the Guarding or Pain She Presents in FCE**
10

11      On May 2, 2006, Kolman submitted an Addendum to his FCE after reviewing four
12  surveillance videos of Edwards.  Kolman stated Edwards performed "a variety of tasks that were
13  also covered in the FCE."  He noted the activities Edwards performed on videotape generally fell
14  into two categories in relationship to the FCE:  (1) activities that were also performed to similar
15  levels in the FCE and (2) activities that were performed to a similar level as the FCE, but seem to
16  require less effort or cause less pain than in the FCE.  Kolman noted Edwards did not appear to
17  exhibit guarding or pain in the way she did in the FCE.  He also noted she did not exhibit the
18  deviations, including Antalgic gait and decreased hip flexion, observed in the FCE.

19      With regard to pushing the shopping cart, Kolman noted during the FCE she was tested
20  pushing a rolling chair with 3.5 pounds on the seat and she was able to perform this task but with
21  core guarding and pain at a level of 5.5 out of 10.  In the video, Mr. Kolman noted Edwards did
22  not appear to be in pain or exhibit guarding while pushing the cart.

23      Kolman also noted during the FCE, Edwards was able to bend over the table and reach,
24  but she was guarded and held her body close to the core.  She also reported too much pain and
25  discomfort to complete the test.  In the video, Edwards was carrying a plant and a bag (weight
26  unknown) and then loaded them into the car without demonstrating the pain or performance
27  deviations she exhibited in the FCE.  Kolman noted Edwards was seen standing for some time
28  while working in the gift shop.  During the FCE, she reported pain during the standing portion at

8

1   a level of 8 on a scale of 1 to 10 with 3-4 position adjustments and moderate deviations including

2   decreased weight bearing to one side and increased hip flexion.  However, Edwards did not

3   appear to be in pain or exhibiting those deviations in the video.  Kolman further noted Edwards

4   was seen on the video on the gift shop floor helping a customer.  Yet, during the FCE, she had a

5   great deal of difficulty getting down to the floor and rising.  Lastly, Kolman noted during the

6   sitting and keyboard tests, Edwards reported pain at 8 on a scale of 1 to 10.  During the video,

7   she was sitting in a car for more than 15 minutes without any apparent pain.  (E00372)

8         **M.        Prudential Requests A Peer Review Report**

9         On June 23, 2006, Prudential requested a Peer Review Report of Edwards' claim.  On

10  June 29, 2006, R. David Bauer M.D., Board Certified in Orthopedic Surgery with a specialty in

11  Spinal Surgery, conducted a peer review and concluded Edwards was mildly functionally

12  impaired.  (E00322-00329)  Based on his extensive experience as a Board Certified Orthopedic

13  Surgeon with a specialty in spinal disease, and his experience in treating failures of fusion

14  devices, he opined that even with severe back pain, a claimant should be able to sit for

15  approximately one hour before needing to change positions.   He noted a claimant would be able

16  to do this for up to eight hours during the working day.  He further noted a claimant would be

17  able to stand for 30-40 minutes before needing to sit and rest and would be able to do that for at

18  least several hours during a day.  These observations were based on Dr. Bauer's experience in

19  the field with similar claimants and Edwards' objective records.  He concluded that Edwards

20  should be able to sit for one hour at a time for 8 hours, stand for 30-40 minutes, reach, lift and

21  carry between 10-15 pounds, and there should be no limitations in repetitive and fine motor

22  activities.

23        Dr. Bauer further noted a mismatch between Edwards' severe symptomatic complaints,

24  as noted in her medical records, and her visualized activities.  He gave her a poor prognosis due

25  to her attitude, anxiety and depression, which were well documented in her medical records.  Dr.

26  Bauer pointed out Edwards' pain increased with concerns about her dog, New Orleans Hurricane

27  Katrina, and vague disasters.  He noted despite complaining the medications were insufficient for

28  her needs, Edwards was able to stockpile significant quantities of pills.  Dr. Bauer noted unless

1  Edwards was weaned off of her pain medication, which could be causing hyperalgesia and

2  depression, the prognosis for her improvement was grim.  Dr. Bauer cited a study about the

3  performance of physicians as mediators of temporary and permanent disability for claimants with

4  chronic musculoskeletal complaint.  He noted physician recommendations limiting activity and

5  work after injury are highly variable, often reflecting their own pain, attitudes and beliefs.

6       Dr. Bauer went on to note Edwards' self-reported functionality was inconsistent with the

7  activities noted in her file and the video surveillance.  The video surveillance caught Edwards

8  working at the volunteer gift shop, standing, kneeling and stooping for lengthy periods.  During

9  her work activities, Edwards displayed no signs of discomfort while working around the store.

10  Dr. Bauer further pointed out the FCE, performed in April of 2006, indicated Edwards was

11  capable of returning to the workplace in a sedentary position.

12       Dr. Bauer concluded he did not believe Edwards' impairments were as severe as she

13  claimed, nor solely physical in nature.  Dr. Bauer opined Edwards' emotional outlook strongly

14  influenced her disability beliefs, and her physicians help her "buy into" the disabled role.  In his

15  experience, it was unusual for a pain management physician to see a claimant once or twice a

16  month when medications were stable, and this reinforced his belief "something [was] wrong."

17  Dr. Bauer noted Edwards could function when she wished to, including bending, lifting, carrying

18  objects such as her dog, or performing activities for her volunteer work.  Dr. Bauer indicated

19  Edwards' perceptions of her functional impairments outweighed the physical realities.  (E00322-

20  00329)

21       **N.    Prudential Denies Long Term Disability Benefits**

22       On July 25, 2006, Prudential determined Edwards no longer met the disability definition

23  under the terms of the Plan.  Prudential based this determination on statements from Edwards,

24  her physicians, her observed activities, the FCE, and the review by Dr. Bauer.

25       Prudential had observed Edwards over a period of days on December 19, 20, 21, 2004,

26  and again on August 17, 18, 21, 2005, and she was seen standing, walking, sitting, driving,

27  bending, kneeling, stooping, and carrying.  She was observed volunteering in a gift shop, doing

28  light shopping and walking her dog.

1    Prudential noted Edwards' FCE on April 13, 2006. The evaluation revealed an overall

2    level of work in the sedentary range and it was determined Edwards demonstrated tolerance for

3    an 8 hour per day, 40-hour workweek. The FCE facilitator opined Edwards had the capacity to

4    perform her own sedentary occupation.

5    Prudential noted Edwards' claim was reviewed in its entirety by Dr. Bauer, a Board

6    Certified Orthopedic Surgeon with a specialty in Spine Surgery. Prudential specifically

7    requested Dr. Bauer comment on appropriate restrictions and/or limitations in terms of Edwards'

8    ability to sit, stand, walk, reach, lift, carry, perform repetitive upper extremity and fine motor

9    activities. Dr. Bauer opined Edwards should be able to sit for 1 hour at a time for 8 hours, stand

10   for 30-40 minutes, reach, lift and carry between 10-15 pounds, and there should be no limitations

11   in repetitive and fine motor activities. Dr. Bauer found a definite mismatch between what

12   Edwards states she can do and what her observed activities show her doing. Prudential

13   concluded Edwards had at least sedentary capacity. Prudential noted that since Edwards'

14   occupation was sedentary in nature, Edwards was capable of performing the material and

15   substantial duties of her own occupation and that as of July 25, 2006, she no longer met the

16   definition of Totally Disabled under the LTD Plan. Prudential stated that benefits would

17   terminate effective July 25, 2006. (E01103-01105) Prudential thereafter agreed to issue the

18   equivalent of one month of benefits as a measure of assistance to Edwards so as not to terminate

19   benefits with only six days notice. (E01101)

20   **O.    Prudential Clarifies the Termination of Benefits and Provides Edwards with
        a Copy of the Claims File and Related Documents**

21

22   On August 7, 2006, Prudential sent the FCE, External File Review, Surveillance Reports,

23   and Summary Plan Description to Edwards. Prudential noted it would not pay any further

24   benefits. (E01098) On August 15, 2006, Prudential sent copies of the unedited surveillance

25   tapes to Edwards. Prudential clarified its decision to terminate benefits was based on a review of

26   all of the medical information in Edwards' file from treating providers, in addition to the FCE,

27   Independent External File Review, and surveillance tapes. Edwards had full-time sedentary

28   capacity and therefore was no longer disabled according to the terms of the Plan. (E01096)

**P.   Edwards Appeals Prudential's Decision to Deny Further Benefits**

On January 16, 2007, as a courtesy, Prudential granted Edwards a 30-day extension, until March 5, 2007, to file her complete appeal. Edwards retained new counsel, David M. Lilienstein, Pillsbury & Levinson, LLP. On March 5, 2007, Lilienstein wrote a letter to Prudential appealing Prudential's decision to terminate Edwards' LTD benefits.

**Q.   Prudential Arranges for a Second Peer Review**

On May 23, 2007, Prudential requested MLS arrange for a second peer review of Edwards' claim by a physician who specializes in Physical Medicine and Rehabilitation/Pain Management.

On June 11, 2007, the Independent Peer Review Report by Jack Denver, M.D., Board Certified in Physical Medicine and Rehabilitation, was provided. (E00049-00058). Dr. Denver noted Edwards' job as a Loan Consultant is a sedentary job in which Edwards processed residential loan applications for WAMU.

Dr. Denver commented on Edwards' functionality based on the video surveillance. He noted Edwards was seen standing, kneeling and stooping without signs of discomfort. She was also seen performing activities including walking, driving, standing, bending and carrying. She was observed working in the gift shop for five hours and standing for extended periods while working. Dr. Denver further noted Edwards was seen walking a small dog and grocery shopping.

Dr. Denver commented on the functional impairment noted in the medical documentation. As of September 1, 2006, Edwards did have mid lumbar range of motion impairment as indicated by both Drs. Light and Wolfe. Dr. Denver noted Dr. Wolfe provided little basis for a significant impairment. Dr. Denver pointed out that Edwards' physical examinations were within normal limits with no documented loss of range of motion or specific impairment. Dr. Denver pointed out Dr. Light's documents showed limited spinal range of motion on September 6, 2006, which would be appropriate given Edwards' surgery.

Dr. Denver identified the appropriate restrictions and limitations from September 1, 2006 forward. He concluded Edwards would have no restrictions in sitting, standing, walking and

12

1    upper body gross and fine motor activities including reaching. She would be able to occasionally

2    stoop. She would be restricted in kneeling and squatting frequently. She would be restricted

3    from balancing and climbing ladders. She would be restricted to lifting and carrying up to ten

4    pounds occasionally and five pounds frequently. She would be restricted to pushing and pulling

5    up to ten pounds occasionally and five pounds frequently. Dr. Denver concluded these

6    restrictions would be considered permanent.

7         **R.**      **Dr. Denver Watches the Video Surveillance and Finds Edwards is Much
More Functional than She Claims and Can Engage in a More Active**

8                 **Lifestyle, Including Full Time Work Activities Within Her Restrictions**

9         Dr. Denver commented on whether Edwards' surveillance documentation was consistent

10    with the medical documentation, her complaints of chronic pain, and her ability to sustain full-

11    time work. Dr. Denver concluded the surveillance documentation was not consistent with

12    medical documentation provided by Drs. Wolfe and Light. Dr. Denver pointed out the medical

13    documentation indicated Edwards was totally and permanently disabled, including work with

14    sedentary duties. Dr. Denver noted the surveillance documentation showed Edwards performing

15    at least sedentary duties. The surveillance showed Edwards standing for most of her five hour

16    shift, kneeling and stooping. The surveillance also showed her, after working at the gift shop for

17    five hours, driving to the grocery store for additional activities. Dr. Denver opined Edwards is

18    much more functional than she claimed to be and can engage in a more active lifestyle, including

19    full time work activities within her restrictions.

20         Dr. Denver commented the medical findings do not correlate with longstanding

21    impairment. He noted the duration of expected impairment is to be permanent based on the

22    presence of a permanent lumbar range of motion impairment. He indicated Edwards would be

23    expected to have limited range of motion because she was fused from L4 through S1. (E00049-

24    00058)

25         **1.**      **Dr. Denver Found the FCE Showed an Overall Level of Work
Consistent with the Sedentary Range**

26

27         On July 16, 2007, Prudential wrote to MLS and requested Dr. Denver comment on the

28    April, 2006 FCE report, because this commentary was not included in his original report.

1    Dr. Denver stated the FCE demonstrated an overall level of work consistent with sedentary

2    range, which allows exertion of up to ten pounds of force occasionally and/or a negligible

3    amount of force frequently to lift, carry, push, pull or otherwise move objects, including the

4    human body.  Dr. Denver noted that because the overall level of work during the examination

5    was limited by medical restrictions to four pounds, it did not provide an adequate opportunity to

6    test the patient.  With regard to tolerance for working an eight hour day, Dr. Denver felt Edwards

7    had the capacity for unrestricted sitting.  He opined Edwards' inability to sustain sitting is more

8    of a tolerance issue than a capacity issue.  He noted there was no specific impairment or lumbar

9    instability that would prevent sitting in an unrestricted fashion.

10           **2.      Dr. Denver Communicated with Drs. Light & Wolfe**

11           Dr. Denver's conversations with Drs. Light and Wolfe did not alter his prior conclusions.

12   He noted Dr. Light indicated there was no impairment relating to spinal structural stability.  This

13   was consistent with Dr. Denver's prior conclusion.  Dr. Denver also noted Dr. Wolfe's opinions

14   regarding Edwards' inability to work are primarily based on tolerance issues rather than true

15   measurements of impairment and therefore do not alter Dr. Denver's overall assessment.

16   (E0029-00031)

17           **S.      Prudential Upholds Termination of Benefits – September 6, 2007**

18           On September 6, 2007, Prudential informed Edwards it was upholding the decision to

19   terminate her LTD benefits, effective September 1, 2007.  To evaluate Edwards' appeal,

20   Prudential requested updated medical data from after March 2006 from Drs. Light and Wolfe,

21   Prudential conducted a detailed telephone discussion with Edwards, Prudential had a consulting

22   physician, Dr. Denver, review Edwards' file, and Dr. Denver spoke with Drs. Light and Wolfe.

23           In upholding its decision terminating her LTD benefits, Edwards was informed again

24   about the review of her medical data, her observed activities, conversations with Edwards'

25   treating physicians, Dr. Denver's assessment, and the provisions of the LTD Plan.

26   **III.    THE LEGAL STANDARD OF REVIEW**

27           **A.      The Standard of Review**

28           The parties in the instant matter have stipulated to a *de novo* standard of review.  On *de*

1  *novo* review, the court "simply proceeds to evaluate whether the plan administrator correctly or

2  incorrectly denied benefits, without reference to whether the administrator operated under a

3  conflict of interest." *Abatie v. Alta Health & Life Ins. Co.*, 458 F.3d 955, 963 (9th Cir. 2006).

4  Plaintiff "must carry the burden to prove that she was disabled under the meaning of the plan."

5  *Sabatino v. Liberty Life Assurance Co. of Boston,* 286 F.Supp.2d 1222, 1232 (N.D. Cal. 2003).

6      **B.      The Governing Plan Language Pertinent to This Claim**

7  "Total disability" exists when Prudential determines that all of these conditions are met:

8      (1)    Due to Sickness or Accidental Injury, both of these are true:

9              (a)    you are not able to perform, for wage or profit, the material and substantial
                       duties of your occupation.

10
              (b)    After the Initial Duration of a period of Total Disability, you are not able
11                     to perform for wage or profit the material and substantial duties of any job
                       for which you are reasonably fitted by your education, training or
12                     experience. The Initial Duration is shown in the Schedule of benefits.

13     (2)    You are not working at any job for wage or profit.

14     (3)    You are under the regular care of a doctor.

15  "Partial Disability" exists when Prudential determines that all of these conditions are met:

16     (1)    Due to Sickness or Accidental Injury you are not able to perform, for wage
              or profit, the material and substantial duties of your occupation on a full-
17             time basis.

18     (2)    You are working for wage or profit:

19             (a)    at your own occupation, but you are not able to perform your duties on a
                       full-time basis; or
20
              (b)    at another occupation
21
    The amount of your monthly earnings is your Partial Disability Earnings.
22
       (3)    Your Partial Disability Earnings are not more than 80% of your Pre-
23             Disability Earnings. Your Pre-Disability Earnings are the amount of your
              monthly Earnings before your period of Total Disability began.
24
       (4)    You are under the care of a Doctor.
25
    "Disability" means either Total Disability or Partial Disability
26

27

28

IV. **PRUDENTIAL'S DECISION DENYING LTD BENEFITS WAS CORRECT AND SUPPORTED BY THE ADMINISTRATIVE RECORD**

A. **The Video Surveillance Contradicts Edwards' Claims**

The Ninth Circuit has held in favor of insurers or claim administrators when videotaped surveillance shows a plaintiff's activities are contrary to the plaintiff's claims of disability or pain. *See Litt v. Paul Revere Life Ins. Co.*, 2006 WL 1095847 (N.D. Cal. April 25, 2006) (where plaintiff alleged she was virtually bedridden in the days following a FCE and surveillance showed her performing various activities, including driving and grocery shopping without signs of pain, the court found a "conflict between plaintiff's reported symptoms on the one hand, and the evidence of plaintiff's activities and functional capacity on the other"); *Eppler v. Hartford Life and Acc. Ins. Co.*, 2008 WL 3266469 (N.D. Cal. Aug. 7, 2008) (where the court held plaintiff was observed in video surveillance exhibiting a level of activity inconsistent with the reports he had been giving to his doctors and plaintiff's own physicians reported his condition had improved); *see also Pollard v. Liberty Life Assur. Co.*, 2006 WL 1867726 (N.D. Cal. July 6, 2006) (where the court found surveillance showing plaintiff performing activities such as sweeping, driving, loading a camper, and sitting for a long period, inconsistent with her alleged disability); *see Hornback v. New York Times Co. Long Term Disability Plan*, 2006 WL 496050 (N.D. Cal. March 1, 2006) (where the court held video surveillance of plaintiff using her arms without signs of discomfort evidenced malingering).

The videotaped surveillance of Edwards' activities contradicts her disability claim that severe disability prevents her from performing sedentary work. Edwards contends she suffers from constant pain, which prevents her from maintaining any sedentary position. However, the real story is told by surveillance videos and surveillance reports because this evidence shows Edwards is capable of performing many sedentary and non-sedentary activities, such as standing for hours, walking, sitting, driving, bending, kneeling, stooping and carrying.

The video surveillance conducted on December 19, 2004, shows Edwards driving herself and another woman to the hospital gift shop where she was observed working for four hours and standing on her feet for extended periods. This was followed by a trip to the grocery store where

1    she did some shopping.

2        Edwards states in her March 5, 2007 appeal letter she cannot work one day a week for a

3    three-hour shift at the gift shop without being bed-bound. (E00217-00225) The videotaped

4    surveillance shows otherwise.

5        On December 20, 2004, the day after Edwards volunteered at the gift shop, she was

6    observed driving to an appointment and then driving to an apartment complex where she walked

7    a dog. Edwards then proceeded to a garden center where she bought several indoor plants, then

8    carried them to her car and placed them in her trunk. After this, Edwards went shopping. When

9    Edwards returned home, she was observed leaning forward, reaching down towards a dog and

10   walking the dog down her driveway and along the sidewalk. Edwards' activities included

11   walking, driving, standing, leaning, and bending. The videotaped surveillance shows Edwards

12   was neither bedridden, nor disabled from performing numerous activities the day after she

13   volunteered at the gift shop and went grocery shopping on December 19, 2004.

14       The facts here are the same as in *Litt v. Paul Revise Life. Ins. Co., supra,* where the

15   plaintiff claimed she was "virtually bedridden" for several days following a FCE. *Litt v. Paul*

16   *Revere Life. Ins. Co.,* 2006 WL 1095847 at *7. Video surveillance conducted on the days

17   following the *Litt* plaintiff's FCE showed her pushing a shopping cart, placing items into her

18   vehicle and removing them, carrying grocery bags and personal items, driving, and walking with

19   a purse hanging from her shoulder, with no signs of physical difficulty or discomfort. *Id.* The

20   claim administrator concluded the plaintiff's restrictions and limitations were exaggerated in

21   light of her observed activities and the *Litt* court found in favor of defendants. *Id.* At 13.

22       Here, when Edwards drove to her appointment on December 20, 2004, she sat in her car

23   for twenty minutes and talked on her cellular phone without any signs of pain. Edwards never

24   stepped out of the vehicle to walk around, or even stand up for a minute.

25       Likewise, the surveillance conducted on August 21, 2005 shows Edwards volunteering at

26   the gift shop for approximately four hours where she was observed kneeling, bending, and

27   twisting to assist a customer. Edwards was videotaped standing at the cash register, kneeling to

28   assist a customer, and bending and twisting on the ground looking for CDs. She displayed no

1    signs of discomfort while working around the store.

2           The videotaped surveillance completely undermines Edwards' credibility and her claims,

3    i.e., that she cannot perform sedentary work and that volunteering at the gift shop leaves her

4    bedridden the next day.

5    **B.    Edwards' Credibility Is Undermined By The Discrepancies Between Her Behavior During the FCE And On Video**

6

7           Ninth Circuit legal authority indicates insurers and administrators may rely on FCE

8    results in terminating disability benefits. In *Hoskins v. Bayer Corp. and Business Services Long*

9    *Term Disability Plan*, 2008 WL 2561959, *1 (N.D. Cal. June 25, 2008), the court held the

10   defendant properly denied disability benefits where the FCE administrator concluded the

11   plaintiff "demonstrated the minimal ability to perform in a sedentary level over an 8-hour day

12   and that maximal strength levels, positional tolerances, limitations and accommodations could

13   not be clearly defined due to lack of participation, sub-maximal and unreliable efforts, and

14   symptom exaggeration behaviors." In *Litt v. Paul Revere Life. Ins. Co., supra,* the plaintiff's

15   FCE results showed she did not "demonstrate" the ability to work but exhibited symptom

16   magnification, and because of her self-limiting performance, most abilities remained open to

17   conjecture. *Id.* at *7.

18          The facts here support denial of LTD benefits as in *Litt* and *Hoskins.* Edwards' FCE

19   results show she is capable of working and should alternate between standing, sitting, and

20   walking. Furthermore, the instant video surveillance undermines Edwards' alleged tolerance

21   issues and guarding behavior exhibited during her FCE.

22          Kolman's Addendum to his FCE indicates Edwards misrepresented her abilities during

23   the FCE. Kolman points out the following discrepancies between the way Edwards presented

24   herself during the FCE and the way she functioned on videotaped surveillance:

25   • Edwards did not appear to be guarding or in pain on the videotaped surveillance like she

26        did when performing similar activities in the FCE.

27   • On the videotaped surveillance Edwards did not exhibit deviations, including Antalgic

28        gait and decreased hip flexion, observed in the FCE.

1    • When Edwards was pushing a shopping cart with 3.5 pounds of weight during the FCE

2       she performed this task with core guarding and reported a pain level of 5.5/10.

3       However, she did not appear to be in pain or exhibit guarding behavior while pushing

4       the cart in the video.

5    • During the FCE, Edwards was able to bend over the table and reach, but was guarded,

6       held her body close to the core, and reported too much pain and discomfort to complete

7       the test.  Yet in the video, Edwards was carrying a plant and a bag and loaded these

8       items into a car without demonstrating the pain or performance deviations she exhibited

9       in the FCE.

10   • Edwards was seen standing for some time while working in the gift shop.  However, she

11      reported pain during the standing portion of the FCE at a level of 8/10, with 3-4 position

12      adjustments and moderate deviations.  On video surveillance she neither appeared to be

13      in pain nor exhibited those deviations.

14   • The video surveillance shows Edwards was down on the floor helping a customer in the

15      gift shop yet she exhibited a great deal of difficulty getting down to the floor and rising

16      in the FCE.

17   • Edwards reported pain at a level of 8/10 during the sitting and keyboard tests in the FCE,

18      but during the video she is observed sitting in a car for more than 15 minutes without

19      any apparent pain whatsoever.  (E00372)

20      The numerous discrepancies indicate Edwards misrepresented her abilities and is far

21   more capable than she chose to demonstrate during the FCE.  This contradicts Edwards' claims

22   and undermines her credibility.

23   **C.    The Video Surveillance Contradicts Edwards' Stated Limitations in Her
         Activities of Daily Living Questionnaire**

24

25      In Edwards' Activities of Daily Living Questionnaire dated December 15, 2005, she

26   indicates she is limited to 10 to 15 minutes of sitting, standing, and waking.  However, the video

27   surveillance shows Edwards standing in the gift shop for prolonged periods of time and sitting in

28   her car, talking on her cell phone for over 15 minutes without any signs of pain.

1
2

**D.    Prudential's Decision is Supported by the Opinions of Two Board Certified External Reviewing Physicians**

3      Prudential's decision to terminate Edwards' LTD benefits is consistent with and
4  supported by the opinions of two different Board Certified external reviewing physicians.

5      Dr. Bauer's peer review report concluded Edwards was mildly functionally impaired.
6  Based on his experience and expertise as a Board Certified Orthopedic Surgeon with a specialty
7  in Spinal Disease and treating failures of fusion surgery, he concluded Edwards should be able to
8  sit for one hour at a time for eight hours, stand for 30-40 minutes, reach, lift and carry between
9  10-15 pounds, and there should be no limitations in repetitive and fine motor activities.  In
10  addition, Dr. Bauer did not believe Edwards' impairments were as severe as claimed nor solely
11  physical.  He opined Edwards' emotional outlook strongly influenced her disability beliefs, and
12  her physicians helped her "buy into" the disabled role.

13      Edwards' own treating physician, Dr. Wolfe, stated in his letter dated February 13, 2007,
14  that he would not refute Dr. Bauer's report.  (E00322-00329)

15      Dr. Denver's peer review report and findings were in line with the FCE and Dr. Bauer's
16  reports.  Dr. Denver noted Dr. Wolfe provided little basis for significant impairment and pointed
17  out that physical examinations were reported to be within normal limits with no documented loss
18  of range of motion or specific impairment noted.  Dr. Denver noted Dr. Light's documents
19  showing limited spinal range of motion on September 6, 2006 would be appropriate given
20  Edwards' surgery.

21      Dr. Denver commented on Edwards' functionality based on the video surveillance.  He
22  noted Edwards was seen standing, kneeling and stooping without signs of discomfort.  He found
23  the surveillance inconsistent with medical documentation provided by Drs. Wolfe and Light
24  indicating Edwards was totally and permanently disabled, including any sedentary duties.
25  Dr. Denver stated the surveillance showed Edwards performing at least sedentary duties.  He also
26  opined Edwards' FCE demonstrated an overall level of work consistent with sedentary activities.
27  Dr. Denver opined Edwards was much more functional than she claimed and could engage in a
28  more active lifestyle that included full time work within her restrictions.

1

**E.    Edwards' Physicians Document Improvement in Her Condition**

2      Edwards' treating physicians' documented improvement in Edwards' condition.  On

3  January 5, 2005, Dr. Light noted Edwards had good sensation, reflexes, and strength in her legs.

4  He recommended she continue walking and exercising and noted Edwards was stable.  On

5  January 24, 2006, Dr. Wolfe noted Edwards' nerve pain and overall pain had decreased, and

6  radiating pain with the feeling of weakness was gone.  He further noted Edwards' back pain had

7  improved and she had a better activity tolerance.  (E00413-00415).

8      The instant matter is similar to *Eppler v. Hartford Life and Acc. Ins. Co.*, *supra*, where

9  the court granted the defendants' motion for summary judgment.  In *Eppler,* the plaintiff brought

10  claims for LTD benefits alleging severe sleep apnea causing fatigue and inability to think and

11  concentrate.  *Id.*  Eppler's claims included that he could only stand for 10 to 15 minutes, could

12  not drive, and walked with a limp.  *Id.* at *2.  The claim administrator obtained videotaped

13  surveillance of Eppler that showed him attending a baseball game, driving, walking, and standing

14  continuously.  *Id.*  *Eppler* found the plaintiff's observed activity level on video-surveillance

15  inconsistent with the plaintiff's reports and noted his own treating physicians reported

16  improvement in his condition.  *Id* at *7.

17      Hence, the video surveillance shows Edwards' activity level is inconsistent with her

18  claimed impairments and Edwards' own treating physicians, Drs. Light and Wolfe, document

19  improvement in her condition.

20  **V.    EDWARDS' CLAIM FOR EQUITABLE RELIEF IS IMPROPER AND MUST BE
DENIED**

21

22      Edwards' claim for equitable relief pursuant to 29 U.S.C. section 1132(a)(3) fails because

23  it is legally and factually invalid.  It is legally invalid because Edwards seeks to recover LTD

24  benefits under ERISA 502(a)(1)(B) or U.S.C. section 1132(a)(1)(B), which provides an adequate

25  legal remedy if Edwards prevails on her claim for disability benefits.  As noted in Defendants'

26  Motion to Dismiss, prevailing legal authority indicates equitable relief available under section

27  1132(a)(3) is limited to injuries not adequately addressed under other ERISA provisions.  *Varity*

28  *Corp. v. Howe*, 516 U.S. 489, 512 (1996); *Ford v. MCI Comm. Corp. Health & Welfare Plan,*

1 | 399 F.3d 1076, 1083 (9th Cir. 2005); *Forsyth v. Humana, Inc.*, 114 F.3d 1467, 1474-1475 (9th

2 | Cir. 1997); *Korotynska v. Metropolitan Life Ins. Co.*, 474 F.3d 101, 106-107 (4th Cir. 2006).

3 |      Edwards has no facts to support a position that her claim cannot adequately be remedied

4 | under ERISA section 1132(a)(1)(B) if she is prevails because no such facts exist in this case.

5 | Although the Court permitted Edwards' claim to survive at the dismissal stage, she has no

6 | grounds to support her equitable relief claim at this juncture.  The record is complete and it

7 | contains evidence pertaining solely to Edwards' claim, which was properly denied by Prudential.

8 | **VI.**    **CONCLUSION**

9 |      Prudential correctly terminated Edwards' LTD benefits.  The weight of the evidence in

10 | the record supports a finding that Edwards does not meet the definition of disability under the

11 | LTD Plan.  Defendants request Edwards' claims be dismissed with prejudice.

12 | DATED:  September 11, 2008

13 |                     GORDON & REES LLP

15 |            By_____

16 |               Ronald K. Alberts

              Tad A. Devlin

17 |               Attorneys for Defendants

              THE PRUDENTIAL INSURANCE COMPANY

18 |               OF AMERICA, REAL PARTY IN INTEREST,

              AND THE H.F. AHMANSON & COMPANY

19 |               LONG TERM DISABILITY PLAN